**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

NAJEE ABDULLAH,

     Plaintiff,

v.                                   Case No:  6:14-cv-629-Orl-40TBS

OSCEOLA COUNTY SHERIFF,
GARRETT LANE in his individual
capacity, and PUBLIX SUPER
MARKETS, INC.,

     Defendants.

_____

**<u>ORDER</u>**

This cause comes before the Court without oral argument on the following:

1. Defendant Publix Super Markets, Inc.'s Motion for Summary Judgment
   (Doc. 35), filed May 1, 2015;

2. Plaintiff's Memorandum of Law Submitted in Opposition to Defendant's
   Motion for Summary Judgment (Doc. 45), filed May 15, 2015;

3. Motion for Summary Judgment by Defendants Sheriff and Lane (Doc. 37),
   filed May 4, 2015;

4. Plaintiff's Memorandum of Law Submitted in Opposition to Defendants'
   Motion for Summary Judgment (Doc. 46), filed May 18, 2015; and

5. Defendants' Reply to Plaintiff's Response in Opposition to Defendants'
   Motion for Summary Judgment (Doc. 48), filed June 1, 2015.

Upon consideration and review of the record as cited by the parties in their
respective briefs, the Court grants Defendants' motions for summary judgment.

## I.     BACKGROUND

This lawsuit arises out of the arrest and subsequent prosecution of Plaintiff, Najee Abdullah, for allegedly uttering a forged check.  On March 27, 2010, two unidentified black males entered a grocery store owned and operated by Defendant, Publix Super Markets, Inc. ("Publix").  (Doc. 39-1).  The first individual approached store clerk Robert Coggins requesting to cash a payroll check.  (Docs. 39-1, 39-2, 39-3).  Mr. Coggins followed Publix's check cashing procedure by inspecting the individual's driver's license, calling the business listed on the check, and verifying that the individual was employed by that business.  (Doc. 39-3).  Mr. Coggins then cashed the first individual's check.  (Doc. 39-3).

Immediately thereafter, the second individual approached Mr. Coggins to cash a payroll check issued by the same business for a similar amount as the check presented by the first individual.  (Doc. 33, 6:8–7:6).  Mr. Coggins states that he became suspicious of the transaction and summoned customer service manager Renee Plesha for assistance.  (*Id.*).  Ms. Plesha examined the check and the second individual's driver's license and noticed that the driver's license, which bore Abdullah's name, had been altered.  (Doc. 32, 5:13–6:10).  Ms. Plesha then called over the store manager to address the issue.  As Mr. Coggins and Ms. Plesha waited for the store manager to arrive, the second individual left the store, abandoning both the driver's license and the paycheck. The store manager subsequently called the police.  (*Id.* at 6:11–19).

An officer responded to the call, investigated, and gathered evidence.  (Doc. 39-1).  The officer ultimately forwarded his findings to Defendant, Detective Garrett Lane, a detective in the economic crimes unit of the Osceola County Sheriff's Office.  Detective Lane investigated further and learned that the check presented by the second individual

was indeed counterfeit.  (Docs. 39-7, 39-8).  A few weeks later, Detective Lane interviewed Mr. Coggins and Ms. Plesha and showed both a photo lineup of six individuals, one of whom was Abdullah.  (Doc. 30, 22:3–23:3).  Although Mr. Coggins was unable to identify the person who presented the counterfeit check, Ms. Plesha positively identified Abdullah.  (Docs. 39-9, 39-10).  Detective Lane also reviewed video surveillance of the evidence and concluded that the individual who presented the counterfeit check "strongly resemble[d]" Abdullah.  (Doc. 39-7, p. 1; Doc. 39-11).

As a result of his investigation, Detective Lane concluded that there was probable cause to believe that Abdullah was the individual who presented the counterfeit check to Publix and forwarded his findings to the State Attorney's Office for review.  (Doc. 39-7, p. 2; Doc. 39-12).  The State Attorney's Office decided to prosecute Abdullah and Abdullah was arrested on July 13, 2010.  (Doc. 37-1, pp. 28–29; Doc. 37-2, p. 40). Abdullah was ultimately discharged due to the State's failure to bring him to trial within the speedy trial timeframe.  (Doc. 37-3, pp. 2–5).  Abdullah maintains that he was not the individual who presented the counterfeit check to Publix, but was the victim of identity theft.  (Doc. 31, 26:17–22).

Abdullah initiated this action on March 27, 2014 by filing a six-count Complaint in the Circuit Court for the Ninth Judicial Circuit in and for Osceola County, Florida.  (Doc. 2). Defendants timely removed to this Court.  (Doc. 1).  Counts 1 and 2 allege claims for malicious prosecution against Detective Lane and Publix, respectively.  Counts 3 and 4 allege claims for intentional infliction of emotional distress ("IIED") against Detective Lane and Publix, respectively.  Counts 5 and 6 allege claims against Detective Lane and

Osceola County Sheriff Bob Hansell ("Osceola County")[1] pursuant to 42 U.S.C. § 1983 for the violation of Abdullah's civil rights.  The gravamen of Abdullah's Complaint is that Publix's employees and Detective Lane intentionally and maliciously instigated Abdullah's criminal prosecution when they knew or should have known that Abdullah had not committed a crime.  Defendants now move for summary judgment on all counts.

## II.    STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment must "cit[e] to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment.  Fed. R. Civ. P. 56(c)(1)(A).  "The court need consider only the cited materials," but may also consider any other material in the record.  Fed. R. Civ. P. 56(c)(3).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if the fact could affect the outcome of the lawsuit under the governing law.  *Id.* The moving party bears the initial burden of identifying those portions of the record demonstrating a lack of genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Hickson Corp. v. N. Crossarm Co., Inc.*, 357 F.3d 1256, 1260 (11th Cir. 2004).  If the movant shows "an absence of evidence to support the nonmoving

---

[1]    A lawsuit against a local government official in his or her official capacity is treated as a lawsuit against the local government entity itself.  *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

party's case," the burden then shifts to the non-moving party to demonstrate that there are, in fact, genuine disputes of material facts. *Celotex*, 477 U.S. at 325; *see also Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006), *cert. denied*, 549 U.S. 996 (2006).

To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the non-movant must go beyond the pleadings and "come forward with specific facts showing that there is a genuine issue for trial." *Id.* at 587 (emphasis and internal quotation marks omitted); *see also Crawford-El v. Britton*, 523 U.S. 574, 600 (1998) (holding that a non-movant carries its burden on summary judgment only by "identify[ing] affirmative evidence" which creates a genuine dispute of material fact).

In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## III.   DISCUSSION

Detective Lane and Publix move for summary judgment on Abdullah's malicious prosecution and IIED claims on the grounds that Abdullah cannot establish prima facie cases. Osceola County and Detective Lane additionally move for summary judgment on Abdullah's § 1983 claims. Detective Lane asserts that he is entitled to qualified immunity and Osceola County contends that Abdullah cannot prevail on his *Monell* claim as a result. The Court addresses each pair of claims in turn.

###### A.    Counts 1 and 2: Malicious Prosecution

In order to state a claim for malicious prosecution, a plaintiff must establish six elements: (1) a criminal proceeding was instituted or continued against the plaintiff, (2) the present defendant commenced or caused the commencement of such proceeding, (3) the criminal proceeding had a bona fide termination in the plaintiff's favor, (4) there was no probable cause for initiating the proceeding, (5) the present defendant acted maliciously, and (6) the plaintiff suffered damages as a result. *Alamo Rent-A-Car, Inc. v. Mancusi*, 632 So. 2d 1352, 1355 (Fla. 1994). "If any one of the elements is lacking, an action for malicious prosecution will not lie." *Union Oil of Cal. Amsco Div. v. Watson*, 468 So. 2d 349, 353 (Fla. Dist. Ct. App. 1985), *review denied*, 479 So. 2d 119 (Fla. 1985). The Court limits its discussion to the issue of probable cause, which is raised by both Publix and Detective Lane in their motions for summary judgment. (Doc. 35, pp. 5–14; Doc. 37, pp. 16–17).

The question of probable cause in a Florida malicious prosecution claim is a mixed question of law and fact. *Alamo Rent-A-Car*, 632 So. 2d at 1357. When the evidence supporting a probable cause determination is in dispute, the absence of probable cause is a question for the jury. *Id.* However, when the facts are found to be undisputed and the only issue remaining is the interpretation of those facts, as is the case here, the absence of probable cause can be resolved as a matter of law. *Id.*

In order to establish the absence of probable cause, "the plaintiff must show that the original criminal proceeding was initiated 'without a reasonable ground of suspicion'" that the plaintiff committed the crime charged. *Burge v. Ferguson*, 619 F. Supp. 2d 1225, 1241 (M.D. Fla. 2008) (quoting *Burns v. GCC Beverages, Inc.*, 502 So. 2d 1217, 1219 (Fla. 1986)). A person need not have convincing proof or proof beyond a reasonable

doubt that the accused committed a crime. *Lee v. Ferraro*, 284 F.3d 1188, 1195 (11th Cir. 2002). Rather, all that is required are circumstances which "cause a reasonably cautious person to believe that the accused is guilty of the charged offense." *Sharp v. City of Palatka*, 529 F. Supp. 2d 1342, 1351 (M.D. Fla. 2007).

### 1. Publix

With respect to Publix, the Court finds no genuine dispute that Publix had probable cause to believe that Abdullah presented a counterfeit check. Mr. Coggins and Ms. Plesha both testified at their depositions that they were trained by Publix to identify "red flags" they should look out for when a person approaches them to cash a payroll check. Such red flags include strange behavior, attempts to distract, checks that approach Publix's $500 check cashing limit, multiple checks issued by the same payor, and irregularities with identification produced by the payee. (Doc. 32, 14:25–16:1, 16:20–17:24, 19:4–7; Doc. 33, 18:1–19:7).

Mr. Coggins, the first Publix employee to interact with the individuals, relays a number of red flags which raised his suspicion:

> [A] gentleman came up and was trying to cash a payroll check. I went through the process and I cashed the first check. And through the process the gentleman that I was dealing with at the time had told me that he was there on his lunch break cashing his check.
>
> While I was dealing with the first gentleman a second gentleman came up and they started talking. And it sounded like they had—they had run into each other. And the one gentleman said to the other, oh, I didn't know you were going to be here.
>
> And so I had—I finished cashing the first check but because of the way they were acting and the fact that the address on both of the checks for the business was on the other side of town it seemed odd to me.

(Doc. 33, 6:8–23).   In addition to the peculiar behavior and circumstances surrounding the transaction, Mr. Coggins found it strange that both checks were issued for similar amounts and that both were very close to Publix's $500 check cashing limit.  (*Id.* at 6:24–7:6; Doc. 39-2).   Moreover, as Mr. Coggins sought assistance from Ms. Plesha and Publix's store manager regarding the questionable situation, the second individual fled the store, abandoning the check and the driver's license, both of which bore Abdullah's name.  (Doc. 33, 7:16–8:2; Doc. 39-2; Doc. 39-5).

Ms. Plesha also recounts that she became suspicious when she noticed that both checks were issued by the same business for similar amounts approaching Publix's $500 check cashing limit.  (Doc. 32, 5:10–18).   Further, when Ms. Plesha and Publix's store manager inspected the driver's license left behind by the second individual, they detected that it had been altered.  (*Id.* at 5:23–6:10, 7:20–23).   As a result, the store manager called the police.  (*Id.* at 7:24–25).   Finally, weeks after the incident, Ms. Plesha identified Abdullah from a photo lineup based on her memory of the second individual.  (*Id.* at 8:23–9:12; Doc. 39-9).   From these facts, a reasonably cautious person would believe that Abdullah was the second individual who presented the counterfeit check.  Publix therefore carries its initial burden of showing that it had probable cause to believe that Abdullah committed the crime with which he was charged.

In his response to Publix's motion for summary judgment, Abdullah first points to what he perceives as conflicting testimony between Mr. Coggins and Ms. Plesha regarding the second individual's suspicious behavior.  Abdullah specifically contrasts Mr. Coggins' testimony that it was strange how both individuals interacted with each other with Ms. Plesha's testimony that she thought the second individual was quiet while he engaged in the transaction.  (Doc. 45, pp. 10–11).   However, the distinction Abdullah

attempts to draw is misleading and easily reconciled by the record.  Mr. Coggins testified that the two individuals appeared to deliberately mention that they worked together as they approached him at the customer service counter, behavior which gave him pause. (Doc. 33, 6:14–18).   On the other hand, Ms. Plesha was not immediately present to observe this initial encounter.  (Doc. 32, 4:20–5:9; Doc. 33, 7:19–23).   Therefore, Ms. Plesha's account of the second individual's quiet demeanor was subsequent to and unconnected with the behavior which initially aroused Mr. Coggins' suspicion.

Abdullah also emphasizes that Mr. Coggins failed to identify Abdullah from a photo lineup, despite his face-to-face interaction with the second individual.  (Doc. 45, pp. 11–12).   Although he is less than clear in his response, Abdullah's point appears to be that the conflicting identifications by Ms. Plesha and Mr. Coggins several weeks after the incident erode any probable cause Publix may have had.  The Court disagrees.  Mr. Coggins' deposition testimony reveals that he could not remember what the second individual looked like and only selected a photo from the lineup because Detective Lane asked him to:

> Q.   And do you recall a detective coming to the store at a later date to speak with you about this same event?
>
> A.   I do.
>
> Q.   You do?
>
> A.   Yes, sir.
>
> Q.   Okay.  And can you tell me what happened when he came to speak with you?
>
> A.   I just remember that it was—it was a while.  It wasn't—it wasn't within a reasonable amount of time they came. And the gentleman showed me mugshots.  He showed me a sheet with six or however many pictures of different mugshots on it and asked me if I could identify the man that had come in and cashed the check.

> And I told him that it had been—I want to say it had been like two months in between the time of the events and the time that the detective actually came. But I told him that it had been a while and that I couldn't remember what he looks like. I deal with, you know, hundreds of people every day. I told him that I couldn't recall what he looks like. And he said—he told me to pick one.
>
> . . . .
>
> Q.   Okay. And I just want to make sure I heard you clearly. You stated that [Detective Lane] came and it was, you know, some time after, not very close in time, maybe possibly two months later.
>
> A.   Right.
>
> Q.   And that he asked you to pick the person that came to the counter that day out of a lineup. And you told him that it had been so long ago that you didn't really remember what the person looked like. Is that what you said?
>
> A.   Correct.
>
> Q.   And he told you to just pick one even after you told him that?
>
> A.   Correct.

(Doc. 33, 11:25–13:16). Mr. Coggins very openly informed Detective Lane that too much time had passed and that he could no longer remember what the second individual looked like. Mr. Coggins only selected a photo from the lineup—a photo which was not Abdullah's—after being directed by Detective Lane to make a selection. Mr. Coggins' selection is therefore not a conflicting identification as Abdullah would suggest and does not detract from Plesha's positive identification of Abdullah based on her recollection of the second individual.

Finally, Abdullah tries to create a genuine factual dispute by claiming that Publix and its employees should have done more to determine the true identity of the second

individual.  (Doc. 45, p. 11).  Specifically, Abdullah submits that "the biggest 'red flag' should have been how the signatures on the driver's license and the check were not even remotely close."  (*Id.*).  Abdullah goes on to impugn Mr. Coggins and Ms. Plesha, asserting that if they "would have paid attention . . . they should have concluded that [Abdullah] was not the suspect."  (*Id.*).

However, Abdullah fails to produce any affirmative evidence to support his position.  While the summary judgment record includes a copy of Abdullah's driver's license which bears his signature, Abdullah only produces the face of the counterfeit check presented to Publix, making a comparison of the driver's license signature with any endorsement on the check impossible.  (*See* Doc. 45-3; Doc. 45-4).  Moreover, even assuming that the signatures were clearly different, Publix is not required to gather every iota of proof or to seek out mitigating evidence to have probable cause to believe that a suspect committed a crime.  *See Lee*, 284 F.3d at 1195.

Abdullah ultimately fails to genuinely dispute that Mr. Coggins was presented with a suspicious check issued to Abdullah by a business located on the opposite side of town in an amount approaching Publix's check cashing limit and that the person who presented the check held a driver's license in Abdullah's name and fled the store the second Publix's store manager was called.  Further, Ms. Plesha, who observed the latter part of the transaction, positively identified Abdullah from a photo lineup as the individual who presented the counterfeit check.  Because Abdullah cannot genuinely dispute that these facts were sufficient to give Publix probable cause to believe that Abdullah was the individual who presented the counterfeit check, summary judgment will be granted in favor of Publix on Count 2.

## 2.   Detective Lane

The Court similarly finds that Abdullah fails to present a genuine factual dispute with respect to Detective Lane.   At his deposition, Detective Lane outlined his investigation of the incident.   First, Detective Lane reviewed the report prepared by the officer who responded to the scene.   (Doc. 30, 12:17–22; Doc. 39-1).   Detective Lane then verified that the check issued in Abdullah's name and presented to Publix was, in fact, counterfeit.   (Doc. 30, 12:25–13–7; Doc. 39-7; Doc. 39-8).   Next, Detective Lane confirmed that the picture on the driver's license left behind by the suspect was Abdullah based on photo records maintained by the Department of Motor Vehicles and compared Abdullah's photograph to the video surveillance footage provided by Publix.   (Doc. 30, 13:7–15:1).   Detective Lane concluded that the individual who presented the counterfeit check was likely Abdullah based on similarities in height, build, skin color, hairstyle, and complexion.   (*Id.* at 15:7–16:6).   Detective Lane then met separately with Mr. Coggins and Ms. Plesha, presented both with a photo lineup, and asked each to identify the second individual who presented the counterfeit check.   (*Id.* at 22:3–23:3).   As mentioned earlier, Ms. Plesha positively identified Abdullah.   (Doc. 39-9).   Based on these facts, a reasonably cautious person would believe that Abdullah was the second individual who presented the counterfeit check to Publix.   As such, Detective Lane carries his initial burden of showing that he had probable cause to believe that Abdullah committed the crime with which he was charged.

In his response to Detective Lane's motion for summary judgment, Abdullah first takes issue with the video surveillance footage produced by Publix.   The extent of Abdullah's argument is that he and the suspect "looked nothing alike."   (Doc. 46, p. 17). However, Abdullah produces no affirmative evidence to substantiate his conclusion.

Additionally, Abdullah's opinion is directly undercut by Ms. Plesha's positive identification of Abdullah based on her own memory of the incident.  (Doc. 32, 8:23–9:12; Doc. 39-9).

Abdullah also raises the issue that the signature on the driver's license does not match the endorsement on the counterfeit check and that this fact should have caused Detective Lane to question whether Abdullah was actually the individual involved. (Doc. 46, pp. 17–18).  However, as discussed previously, Abdullah provides no evidence to support his position.  Abdullah does not produce the back of the counterfeit check to show that the signatures were clearly different.  (*See* Doc. 46-3).  Moreover, even if he had, the law does not require Detective Lane to gather every iota of proof or seek out mitigating evidence in order to have probable cause.  *See Lee*, 284 F.3d at 1195.

Abdullah next claims to have produced a timecard from his job showing that he was at work forty minutes prior to when the individual who presented the counterfeit check walked into Publix.  (Doc. 46, p. 18).  Abdullah's point seems to be that because he was at work forty minutes prior to the incident, it was impossible for him to then appear at Publix at the time of the incident.  However, Abdullah again produces no affirmative evidence to support this notion.  To begin, the timecard does not list the name or address of the business which issued it and Abdullah has not otherwise produced the information. (*See* Doc. 46-5).  Second, the portion of the timecard which purportedly displays Abdullah's clock-in and clock-out times is entirely illegible, preventing the Court from verifying Abdullah's claim.  (*See id.*).  Third, even if it could be verified that Abdullah was at work forty minutes prior to when the suspect walked into Publix, Abdullah produces no affirmative evidence demonstrating why this matters.  Abdullah does not show either that he was at work at the time of the incident or that his worksite was so far away from Publix that it would have been impossible for him to arrive by the time of the incident.  Fourth,

even if Abdullah's timecard were to prove that he could not have possibly appeared at Publix at the time of the incident, this fact would not vitiate Detective Lane's original probable cause determination.  *See Chancey v. Wells*, No. 8:04CV1884T24MSS, 2005 WL 2663492, at *5 (M.D. Fla. Oct. 19, 2005) (holding that once probable cause is established, it is not negated by an officer's failure to continue investigating).

Finally, Abdullah alleges that Detective Lane fabricated evidence, coerced witness identifications, and lied to the State Attorney's Office in order to instigate Abdullah's prosecution.  (Doc. 46, pp. 2, 4, 10–13).   Notwithstanding such a serious accusation, Abdullah produces no affirmative evidence in support, instead relying on bald speculation and the twisting of record evidence.   One example of Abdullah's blatant mischaracterization of the record is his claim that "[Detective] Lane also lied in his deposition when he stated that he had contacted [Abdullah] and conducted a search on [Abdullah]." (*Id.* at p. 13).   However, the relevant portion of Detective Lane's deposition reveals that Detective Lane corrected himself and stated that he could not remember whether he contacted Abdullah:

> Q.   Did you make any attempts to contact Mr. Abdullah?
>
> A.   Yes, sir.
>
> Q.   What did you do?
>
> A.   I don't remember specifically in this case.  Typically I would either try to make a phone call or visit his last known address.
>
> Q.   Okay.  Do you know if you actually did it in this case?
>
> A.   I don't recall.

(Doc. 30, 21:18–22:2).[2]  In any event, the Court's review of the record does not even yield the slightest inference that Detective Lane conducted anything less than a comprehensive and unbiased investigation of the incident.

In the end, Abdullah fails to genuinely dispute that Detective Lane thoroughly investigated the incident, determined that the check naming Abdullah as the payee was counterfeit, confirmed that the picture on the driver's license left behind by the suspect was Abdullah's, reviewed video surveillance footage of the incident, and corroborated his suspicion that Abdullah was the individual who presented the counterfeit check with a positive eyewitness identification.  Further, Abdullah's assertions that Detective Lane fabricated evidence, coerced witnesses, and lied to the State Attorney's Office are meritless.  Because Abdullah cannot genuinely dispute that the facts in this case were sufficient to give Detective Lane probable cause to believe that Abdullah was the individual who presented the counterfeit check, summary judgment will be granted in favor of Detective Lane on Count 1.

### B.    Counts 3 and 4: Intentional Infliction of Emotional Distress

In order to state a claim for IIED, a plaintiff must establish four elements: (1) the defendant acted intentionally or recklessly, (2) the defendant's conduct was outrageous, (3) the defendant's conduct caused emotional distress to the plaintiff, and (4) the plaintiff's emotional distress was severe.  *Stewart v. Walker*, 5 So. 3d 746, 749 (Fla. Dist. Ct. App.

---

[2]    Indeed, the Court notes that both of Abdullah's responses to Defendants' motions for summary judgment (Docs. 45, 46) contain a troubling number of false recitations of fact in addition to inflammatory accusations against parties and witnesses which find no traction in the record.  Counsel for Abdullah, Bradley N. Laurent and Carlus Leandrus Haynes, are reminded that the Florida Rules of Professional Conduct demand candor to the tribunal, which includes not making false statements of material fact or forwarding improper arguments.  *See* Fla. R. Prof'l Conduct 4-3.3.

2009).   Detective Lane and Publix submit that Abdullah cannot demonstrate that the conduct is sufficiently outrageous.   (Doc. 35, pp. 23–25; Doc. 37, pp. 17–18).

"The standard for 'outrageous conduct' is particularly high in Florida."   *Patterson v. Downtown Med. & Diagnostic Ctr., Inc.*, 866 F. Supp. 1379, 1383 (M.D. Fla. 1994). Conduct is outrageous where it is "so extreme in degree as to go beyond the bounds of decency and be deemed utterly intolerable in a civilized community."   *Clemente v. Horne*, 707 So. 2d 865, 867 (Fla. Dist. Ct. App. 1998) (citing Restatement (Second) of Torts § 46 cmt. d).   It is insufficient to show tortious or criminal intent and "it is not enough [to show] that the defendant intended to inflict emotional distress."   *State Farm Mut. Auto. Ins. Co. v. Novotny*, 657 So. 2d 1210, 1212–13 (Fla. Dist. Ct. App. 1995); *see also E. Airlines, Inc. v. King*, 557 So. 2d 574, 576 (Fla. 1990).   Instead, "the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'"   *Clemente*, 707 So. 2d at 867 (quoting Restatement (Second) of Torts § 46 cmt. d).

Defendants show that an individual who resembled Abdullah entered Publix and presented a suspicious check to Mr. Coggins, which prompted Mr. Coggins to seek Ms. Plesha's assistance.   (Doc. 33, 6:8–23, 7:16–8:2).   Ms. Plesha also found the check suspicious and noticed that the driver's license presented by the individual had been altered.   (Doc. 32, 5:10–6:10, 7:20–23).   When Ms. Plesha summoned Publix's store manager for further assistance, the individual who presented the check fled.   (Doc. 32, 6:14–19).   As it turned out, both the check and the driver's license bore Abdullah's name. (Doc. 39-2; Doc. 39-5).   Publix thereafter called the police to determine the validity of the check and, upon investigation, Detective Lane concluded that the check was indeed counterfeit.   (Doc. 39-7; Doc. 39-8).   Detective Lane additionally presented a photo lineup

to Ms. Plesha, who positively identified Abdullah as the individual who offered the check to Publix. (Doc. 39-9). With all of this information, Detective Lane found probable cause to believe that Abdullah committed a crime and forwarded his findings to the State Attorney's Office for review. (Doc. 39-7). Defendants therefore carry their initial burden on summary judgment.

In response, Abdullah only claims that Defendants had no reasonable basis to cause Abdullah's prosecution and that such conduct is outrageous. (Doc. 45, p. 19; Doc. 46, p. 19). However, as explained throughout this Order, the record evidence is clear that Publix and Detective Lane were presented with circumstances which would cause a reasonable person to believe that Abdullah committed a crime. Publix therefore acted reasonably when it contacted the police and Detective Lane acted reasonably when, upon a thorough investigation, he determined that it was more likely than not that Abdullah tried to cash a counterfeit check. The fact that Abdullah was not convicted of uttering a counterfeit check is not enough, on its own, to render Defendants' conduct outrageous. *See Borneisen v. Capital One Fin. Corp.*, No. 8:09-CV-02539-T-17TGW, 2011 WL 2730972, at *7–8 (M.D. Fla. July 13, 2011) (concluding that the defendant did not act outrageously when the circumstances would lead a reasonable person to believe that a crime had been committed), *aff'd*, 490 F. App'x 206 (11th Cir. 2012) (per curiam). Defendants' conduct in this case is therefore not outrageous and the Court will grant summary judgment in favor of Detective Lane and Publix on Counts 3 and 4, respectively.

### C.   Counts 5 and 6: Section 1983 False Arrest and Malicious Prosecution Claims

Counts 5 and 6 of Abdullah's Complaint allege § 1983 claims against Detective Lane and Osceola County for the violation of Abdullah's constitutional rights. While

Abdullah does not specifically delineate the type of § 1983 claims he brings against each defendant, it is apparent from his allegations that he seeks relief under the theories that he was falsely arrested and maliciously prosecuted.

Section 1983 provides the procedural mechanism for vindicating constitutionally protected rights violated by persons who act under color of state law.  *Laster v. City of Tampa Police Dep't*, 575 F. App'x 869, 872 (11th Cir. 2014) (per curiam).   A local government such as Osceola County[3] can also be liable for the unconstitutional actions of its officials, but only where the local government is "found to have *itself* caused the constitutional violation at issue."  *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1145 (11th Cir. 2007).

Because the resolution of Abdullah's § 1983 claims for false arrest and malicious prosecution against Osceola County depend on whether Detective Lane violated Abdullah's constitutional rights, the Court must first examine Abdullah's § 1983 claims against Detective Lane.   *See Dahl v. Holley*, 312 F.3d 1228, 1236 (11th Cir. 2002) (holding that a local government cannot be liable under § 1983 unless its officers violated the plaintiff's constitutional rights).   The Court will then turn to Osceola County's potential liability for Detective Lane's actions.

### 1.   Detective Lane

Detective Lane moves for summary judgment on the grounds that he is entitled to qualified immunity.  (Doc. 37, pp. 7–12).  Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established

---

[3]   The determination of whether a party is a local government entity for purposes of § 1983 is a question of state law.  *McMillian v. Monroe Cnty., Ala.*, 520 U.S. 781, 786 (1997).  The parties do not dispute that, for the purposes of this case, Osceola County is a local government under § 1983.

statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To receive qualified immunity, a government official "must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194. A government official acts within his discretionary authority when he "perform[s] a legitimate job-related function . . . through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004).

"Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Lee*, 284 F.3d at 1194. To do so, the plaintiff must make a two-part showing. First, he must demonstrate the violation of a constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009); *Beshers v. Harrison*, 495 F.3d 1260, 1265 (11th Cir. 2007). Second, he must demonstrate that the constitutional right was "clearly established" at the time of the alleged misconduct.[4] *Pearson*, 555 U.S. at 232.

Detective Lane successfully proves that he was acting within his discretionary authority. Detective Lane investigated the presentation of a counterfeit check to Publix in his role as a detective in the economic crimes unit of the Osceola County Sheriff's Office and subsequently forwarded the findings of his investigation to the State Attorney's

---

[4] The Court may address this two-part qualified immunity inquiry in any order, although the United States Supreme Court encourages courts to address the constitutional violation prong first in order to develop a body of clearly established law on the often fact-specific inquiries that arise in the context of § 1983 litigation. *See Pearson*, 555 U.S. at 236 ("The judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.").

Office.[5]  (*See* Doc. 30, 11:2–16:6; Doc. 39-7; Doc. 39-8; Doc. 39-12).   Therefore, the burden shifts to Abdullah to show the violation of a clearly established constitutional right.

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  Enshrined within this guarantee is the right to be free from arrests and prosecutions that are not based upon probable cause.  *See Kingsland v. City of Miami*, 382 F.3d 1220, 1226 (11th Cir. 2004).   "The existence of probable cause at the time of an arrest absolutely bars a § 1983 claim for false arrest under the Fourth Amendment."  *Atterbury v. City of Miami Police Dep't*, 322 F. App'x 724, 727 (11th Cir. 2009) (per curiam).  The existence of probable cause is similarly fatal to a § 1983 claim for malicious prosecution.  *See id.*

As discussed at length in Section III.A, *supra*, probable cause existed at the time of Abdullah's arrest to believe that Abdullah was the individual who presented the counterfeit check to Publix.  Consequently, Abdullah's § 1983 claims for false arrest and malicious prosecution fail as matter of law and summary judgment will be granted in favor of Detective Lane on Count 5.

## 2.    Osceola County

Because Abdullah has not demonstrated the violation of a constitutional right by Detective Lane, he cannot prevail on his § 1983 claims against Osceola County either. *See Dahl*, 312 F.3d at 1236.  The Court will therefore grant summary judgment in favor of Osceola County on Count 6.

---

[5]   Abdullah disputes that Detective Lane was acting within his discretionary authority on the grounds that Detective Lane fabricated evidence, coerced witness identifications, and lied to the State Attorney's Office.  (Doc. 46, p. 12).  For the reasons stated in Section III.A.2 of this Order, the Court finds Abdullah's assertions without merit.

IV.    **CONCLUSION**

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1.  Defendant Publix Super Markets, Inc.'s Motion for Summary Judgment (Doc. 35) is **GRANTED**.

2.  The Motion for Summary Judgment by Defendants Sheriff and Lane (Doc. 37) is **GRANTED**.

3.  The Clerk of Court is **DIRECTED** to enter judgment in favor of Defendants and against Plaintiff.

4.  The Clerk of Court is further **DIRECTED** to terminate all pending motions (Docs. 59, 61, 62, and 69) and to close the file.

**DONE AND ORDERED** in Orlando, Florida on October 8, 2015.

PAUL G. BYRON
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel of Record